# Exhibit J

```
 1                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2
     TERESA PERKINS, as
 3   Successor-in-Interest to
     Decedent Justin Perkins; and
 4   DAVID MICHAEL PERKINS,
 5        Plaintiffs,
 6   vs.                    Case No. 8:19-cv-00315-JLS-JDE
 7   CITY OF ANAHEIM, a municipal
     corporation; SHIAO WANG,
 8   individually and in his
     capacity as a police officer
 9   for the CITY OF ANAHEIM; KENNY
     LEE, individually and in his
10   capacity as a police officer
     for the CITY OF ANAHEIM; and
11   DOES 1-50, inclusive,
     individually and in their
12   official capacities as police
     officers for the CITY OF
13   ANAHEIM Police Department,
14        Defendants.
15
16
17            REMOTE VIRTUAL DEPOSITION
18       OF REBUTTAL EXPERT BENNET OMALU, M.D.
19          TAKEN ON BEHALF OF THE DEFENDANTS
20    ON DECEMBER 4, 2020, BEGINNING AT 10:03 A.M.
21
22
23
24
25   REPORTED BY:  D. Luke Epps, CSR, RPR
```

Page 1

```
 1                    APPEARANCES
 2   On behalf of the PLAINTIFF:
 3        Mr. DeWitt M. Lacy, Esq.
          LAW OFFICES OF JOHN L. BURRIS
 4        9701 Wilshire Boulevard, Suite 1000
          Beverly Hills, California 90212
 5        (310) 601-7070
          ap@johnburrislaw.com
 6
 7   On behalf of the DEFENDANT:
 8        Mr. Gregg M. Audet, Esq.
          ANAHEIM CITY ATTORNEY'S OFFICE
 9        200 South Anaheim Boulevard, Suite 356
          Anaheim, California 92805
10        (714) 765-5169
          gaudet@anaheim.net
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1                          INDEX
 2                                                          Page
 3    Direct Examination by Mr. Audet                          5
 4    Cross-Examination by Mr. Lacy                          106
 5    Redirect Examination by Mr. Audet                      110
 6
 7
 8                         EXHIBITS
 9    Exhibit           Description                          Page
10    Exhibit 1      10/15/20 Medico-Legal Report of          118
                     Bennet Omalu, M.D.
11
      Exhibit 2      Listing of Materials Sent to Dr.         118
12                   Omalu
13    Exhibit 3      Fee Schedule of Bennet Omalu, M.D.       118
14
15
16
17
18
19
20
21
22
23
24
25
                                                        Page 3
```

```
 1                      STIPULATIONS
 2            It is hereby stipulated and agreed by and
 3   between the parties hereto, through their respective
 4   attorneys, that the remote virtual deposition of
 5   Bennet Omalu, M.D., may be taken pursuant to notice
 6   and in accordance with the Federal Rules of Civil
 7   Procedure on December 4, 2020, before D. Luke Epps,
 8   CSR, RPR.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 4
```

1  Q  You would agree, Doctor, that in your role
2  as an expert in this case, your task is to be
3  objective as opposed to being an advocate for the
4  plaintiff's side?
5  A  Yes, of course, to be objective and to
6  rely on the science, which is what I have done.
7  Yes, sir.  Yeah.  Sure.
8  Q  Is it -- is it an accurate statement that
9  your determination as reflected in your report was
10  that the cause of death was Justin Perkins was
11  asphyxial hypoxic brain injury due to
12  mechanical/restraint asphyxiation?
13  A  That's the mechanical-positional, yes,
14  sir.
15  Q  Is there a difference between mechanical
16  and positional asphyxiation?
17  A  No.  They are both the same.  You can't
18  separate the two.  They are one and the same.  It's
19  mechanical, hyphen, positional or mechanical,
20  hyphen, restraint.  So in my report -- in my report,
21  on the last page, page 19, I said the underlying
22  cause of death therefore will be mechanical, forward
23  slash, restraint asphyxiation.
24  Q  Is there a medical distinction between a
25  hypoxic event and asphyxiation or are those things

Page 34

1    Q    And-- why do you think that is not what we
2  have in this case?
3    A    Because Mr. Perkins did not die after the
4  fight or during the fight.  The fight was over, and
5  then the asphyxiation continued, but the fight was
6  over, he was restrained.  He was handcuffed.  He was
7  dazed, confused.  In fact, he was left for a while
8  on the ground alone.  He was no longer a threat to
9  anybody.  So the scenario of self-defense was over,
10 but the asphyxia injury continued.  They moved him
11 away and still placed him on the ground, and the
12 asphyxiation mechanism continued.  At that point it
13 was no longer and could not be described as
14 self-defense, no, because like I said in my report,
15 it was a 20-minute asphyxial event.  The fight did
16 not last for 20 minutes.  The fight lasted for maybe
17 a minute or two, and it was -- the fight was ended
18 when he suffered mechanical asphyxiation by
19 compression of his neck, and it's clearly -- it's
20 not in dispute the mechanical asphyxiation was
21 successful because he passed out.  He became
22 unresponsive, and after he became unresponsive, the
23 compression of the neck was released.  He was
24 handcuffed, but you watch the videos.  Thankfully
25 there were videos here, so we're not relying on

1  people's understanding of what happened.  You watch
2  Mr. Perkins.  He was in what we call a postictal
3  state.  He had suffered a brain injury.  He was now
4  dazed, was confused.  You could see it.  In fact, he
5  was drooling.  Rather than just taking him back,
6  calling 911 to help him as an individual who had
7  just suffered a brain injury, I don't know what
8  happened.  They still placed him down on the ground
9  and three officers pinned him on the ground, and
10 during that asphyxial injury, he became
11 unresponsive.
12     Q    So let me -- let me ask you a different
13 hypothetical, Doctor.  Based on the facts of this
14 case as you understand them, if Justin Perkins had
15 died immediately after being Tased, that still would
16 have been a homicide, correct, medically speaking?
17          MR. LACY:  Objection; calls for an
18 incomplete hypothetical.  Calls for speculation.
19 Lacks foundation.  Calls for expert testimony this
20 witness is not prepared to give.  Dr. Omalu.
21          THE WITNESS:  Again, for each case, you
22 consider each case by its own merit.  There is no --
23 this is not all or null, N-U-L-L.  So you look at
24 each case.  There have been Taser cases that were
25 determined to be accidents.  So you look at a

1   at a cumulative injury exposure, which would now
2   determine the eventual outcome.  So in this case,
3   like I said earlier, luckily we had videos, the
4   total sustained injury window, which culminated in
5   his death or in his irreversible asphyxial brain
6   injury was 20 minutes at least.
7        Q   Okay.  And what, based upon your review of
8   the video, was the first event in that window?
9        A   So the first event, like I said in my
10  report, I have stated all this clearly in my report,
11  began with the conductance of electricity that was
12  about 500 times -- 500,000 times.  I said that on
13  page 17 of my report.  About 500,000 times the unit
14  of electrical current in the human brain.  So he was
15  Tased.  Tasing is an asphyxial type of injury
16  because Tasing sends electricity that causes
17  excitotoxic, excite, excitotoxic injury to the human
18  brain.  Hypoxic-ischemic injury is also an
19  excitotoxic injury.  So they all have the same
20  physiological mechanisms.  So that began with the
21  exposure to high levels of electricity, and then he
22  suffered compression of his neck.
23       Q   How much time, Doctor, passed between the
24  Tasing and the suffering compression of the neck?
25       A   I think I said that in my report.  I would

Page 66

1   Q   Is it your opinion in this case that
2   Justin Perkins getting Tased caused electrical
3   membrane injury?
4   A   I didn't say that.
5   Q   Well, that's what I'm asking you, Doctor.
6   Is that your opinion?
7   A   No, no.  My opinion is in terms of his
8   cause of death, the cumulative injury exposure, that
9   his injury sustainance began with the Tasing, and
10  then the compression of the neck and then the
11  compression of his trunk on the ground.  This is all
12  part of the spectrum.  The Tasing is not mutually
13  exclusive or independent of the spectrum of injury
14  that he suffered.  That's my opinion.
15  Q   So the elements that are listed in the
16  sentence that we just read, "injuries to brain cells
17  and nerve fibers and myofibers of the heart
18  especially the electrical conductance fibers and
19  Purkinje fibers," are you characterizing -- are you
20  placing those characterizations are Justin Perkins'
21  injury or are those just examples?
22  A   I'm explaining -- remember when we began,
23  sir, you said my report should give a foundation for
24  my opinions.  So I'm explaining the physiology,
25  providing foundations.  This is what

Page 69

```
 1   electroconductance does, and this is why it is part
 2   of the spectrum of asphyxial injuries.
 3        Q    So when --
 4        A    They're not opinions.  If you notice, they
 5   are not opinions by themselves.  You said it's a
 6   large paragraph.  In that paragraph, I was providing
 7   a foundation of the physiological mechanisms that
 8   have been established upon which I'm forming my
 9   opinion.
10        Q    Is there objective medical evidence in
11   this case that those factors in that sentence
12   occurred?
13        A    If he was Tased, yes, they occurred,
14   because he was Tased, and even the officer said they
15   Tased him repeatedly.  They didn't give the
16   restraint expectation they wanted.  So if his body
17   received electrical current from a conducting
18   electrical device, yes, but exclusive of the total
19   asphyxial injuries he suffered, that is not what
20   applies to this case.  You cannot break them up like
21   in each and every fiber exposure of asbestos, no.
22   So you look at it as a continuum of exposure
23   beginning with the Taser because mechanoporation,
24   the physiological mechanism that also asphyxial
25   brain injury occurs with, these are all part of the
```

Page 70

1  excitotoxic injury.
2      Q    You reviewed the officers' body-worn
3  camera videos from the incident, Doctor?
4      A    I wouldn't say I reviewed them.  I watched
5  them to help me formulate my opinion.  If you ask me
6  specific questions, I'm not a police standards
7  expert.  I didn't go to the details to explain what
8  happens, no.
9      Q    Well, did you observe in at least one of
10 the videos a point in time when the officers used a
11 Taser on Mr. Perkins?
12     A    That you could hear the noise of the
13 Taser, and you could see the officers Tasing.  The
14 video documented the Tasing.  Now, the specifics I
15 wouldn't remember.
16     Q    Okay.  Did you notice from what you saw in
17 the video, did you see the Tasing have any effect on
18 Mr. Perkins based on your visual observation of the
19 video?
20     A    The video during the struggle -- the
21 physical struggle and altercation was all -- it was
22 difficult to watch because it wasn't focused.  It
23 was moving around.  So during those times I relied
24 on the background noise and the sound the officers
25 were making to the best of my recollection.

Page 71

```
 1              MR. LACY:  I'm fine with that.
 2              MR. AUDET:  Okay.
 3              THE REPORTER:  We are off the record.
 4     (Short break at 12:06 p.m., resumed at 12:16 p.m.)
 5        Q     (BY MR. AUDET)  Dr. Omalu, do you
 6   understand that you are still under oath?
 7        A     Yes, sir.
 8        Q     In your opinion, did Justin Perkins
 9   experience a lethal chain of restraint asphyxial
10   events?
11        A     Yes, sir.
12        Q     And your report characterizes it as that,
13   as a lethal chain on page 17; correct?
14        A     Yes, sir.
15        Q     And would it be a fair statement that the
16   first link in that chain is when Justin Perkins was
17   Tased by the police officers?
18        A     Yes, sir.
19        Q     And the next element in that chain of
20   lethal events was blows to Mr. Perkins' head?
21        A     Yes, sir.
22        Q     And the next link in that chain is
23   mechanical compression of Mr. Perkins' neck?
24        A     Yes, sir.
25        Q     And is it a fair statement that in your
```

Page 75

```
 1   opinion the final link in that chain was when he was
 2   placed on the ground and subjected to positional
 3   pressure?
 4        A    Positional and mechanical, yes, sir.
 5        Q    Okay.  In your opinion, are there other
 6   links in the chain that I'm missing besides those
 7   four types of events?
 8        A    That is it, sir.
 9        Q    And in your opinion, it was the cumulative
10   effect of all of those events that led to his death?
11        A    Yes, sir.
12        Q    Was each one of those four --
13        A    That led to his -- that led to his injury,
14   and the injury led to his death.
15        Q    Are you certain that each of those four
16   was a contributing factor to his injury?
17        A    So like I have said, I cannot answer a
18   question that says each and every exposure.  So my
19   opinion is the cumulative exposure.  I can't say
20   each and every cumulative exposure, sir.
21        Q    So is it possible hypothetically that
22   three of those four things contributed to his death,
23   but one of them didn't?
24        A    Because it's a cumulative exposure,
25   excluding any factor, it's just for the sake of
```

Page 76

```
 1   hypothetical, it's not real.
 2        Q    Well, in order for the cumulative effect
 3   of those four things to result in Mr. Perkins'
 4   injury that led to his death, is each one of those
 5   four things an essential factor in your analysis?
 6        A    Like I have said repeatedly, sir, you
 7   can't break it up.  It's cumulative.  The fact is,
 8   he was -- he began exposure to trauma.  He had
 9   irreversible injury and died.  I can't break it up
10   because it is what it is.  Anything outside of that
11   would be speculative or hypothetical.
12        Q    On page 18, one of your opinions is that
13   Mr. Perkins experienced a mechanical compression of
14   his neck; correct?
15        A    Yes, sir.
16        Q    Is that -- is that referring to an
17   officer's application of a hold on Mr. Perkins?
18        A    A hold is a compression of the neck, yes,
19   sir.
20        Q    Okay.  And is it your understanding that
21   the officers applied what is referred to as a
22   carotid restraint hold on Mr. Perkins?
23        A    No, sir.  When there is a struggle with a
24   human being, sir, it is impractical to apply a
25   carotid hold, and, in fact, the last time I checked,
```

Page 77

```
 1   one of the contraindications of a carotid hold is if
 2   there is a struggle or if the individual is bigger
 3   than you, because once there are some aggravating
 4   factors existing, it is impossible to do a carotid
 5   hold because a carotid hold is meant to be on
 6   somebody who is stationary, who is not moving.  If
 7   the individual is moving, it cannot be a successful
 8   carotid hold.  That is why I tend to move away from
 9   demarcating them.  I just call them a compression of
10   the neck.  It was a compression of the neck, period.
11        Q    Do you make a distinction between a
12   carotid restraint hold and a choke hold?
13        A    I don't, because a choke hold, carotid,
14   all of them, they cause death.  They compress the
15   neck.  The neck is such a vital structure.
16        Q    Have you testified previously, Doctor,
17   under oath that a carotid restraint hold is
18   different than a choke hold?
19        A    Your question, sir, earlier was do I make
20   any difference?  I said no, for me, when I'm
21   analyzing cases.  Now, in the literature, you see
22   carotid hold and the bar hold.  I don't know what
23   you mean by a choke hold.  The bar hold, is that
24   what you're referring to as a choke hold?
25        Q    Do you understand the bar arm hold to be a
```

Page 78

```
 1                          JURAT
 2          PERKINS VS. CITY OF ANAHEIM, ET AL.
 3            I, Bennet Omalu, M.D., do hereby state
 4   under oath that I have read the above and foregoing
 5   deposition in its entirety and that the same is a
 6   full, true and correct transcription of my testimony
 7   so given at said time and place.
 8
 9
10             _____
11             Signature of Witness
12
13
14            Subscribed and sworn to before me, the
15   undersigned Notary Public in and for the State of
16   _____ by said witness, Bennet Omalu, M.D., on
17   this _____day of_____, 20__.
18
19
20
21             _____
22             NOTARY PUBLIC
23             MY COMMISSION EXPIRES:_____
24             JOB FILE #148398
25
```

Page 121

```
 1                    ERRATA SHEET
 2           PERKINS VS. CITY OF ANAHEIM, ET AL.
 3              DEPOSITION OF BENNET OMALU, M.D.
 4            REPORTED BY: D. LUKE EPPS, CSR, RPR
 5         DATE DEPOSITION TAKEN: DECEMBER 4, 2020
 6                    JOB FILE NO. 148398
 7   PAGE    LINE             IS                    SHOULD BE
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____
```

Page 122

```
 1                         CERTIFICATE
 2
 3            I, D. Luke Epps, Certified Shorthand
 4    Reporter, do hereby certify that the witness, Bennet
 5    Omalu, M.D., was by me first duly sworn to testify the
      truth, the whole truth, and nothing but the truth, in
 6    the case aforesaid; that the above and foregoing
      deposition was by me taken in shorthand and thereafter
 7    transcribed; and that I am not an attorney for nor
 8    relative of any of said parties or otherwise
 9    interested in the event of said action.
10            IN WITNESS WHEREOF, I have hereunto set my
11    hand and official seal this 19th day of December, 2020.
12
13
14
15
16         _Luke Epps_
17
18         D. Luke Epps, CSR, RPR
19
20
21
22
23
24
25

                                              Page 123
```