1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

11

CENTRAL DISTRICT OF CALIFORNIA

12

13  TERESA PERKINS, as Successor-in-

14  Interest to

15  Decedent Justin Perkins; and DAVID

16  MICHAEL PERKINS

17

18  vs.

19

20  CITY OF ANAHEIM, at al.
            Defendants.

21

22

CASE NO. 8:19-cv-00315-JLS-JDE

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

23

24      Before the Court is a Motion for Summary Judgment filed by Defendants City of

25  Anaheim and individual officers from the Anaheim Police Department: Shiao Wang,

26  Kenny Lee, Kenneth Edgar, Ricky Reynoso and Casey Morrison (collectively, the "Officer

27  Defendants").  (Mot., Doc. 47.)  Plaintiffs opposed.  (Opp., Doc. 55.)  Defendants replied.

28  (Reply, Doc. 60.)  Having reviewed the papers, held oral argument, and for the reasons

below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.

## I.   **BACKGROUND**

Plaintiffs in this case are Teresa Perkins ("Teresa Perkins")—who brings this wrongful death action individually and as successor-in-interest to her son, decedent Justin Perkins ("Perkins")—and David Michael Perkins ("David Michael"), who is Perkins' uncle. While the Second Amended Complaint ("SAC") is less than a model of clarity as to which plaintiffs assert which claims in what capacity,[1] there are eleven separate causes of action as follows: (1) excessive force against the Officer Defendants under 42 U.S.C. § 1983, (2) denial of medical care by the Officer Defendants under 42 U.S.C. § 1983, (3) interference with 14th Amendment Right to Familial Relations against the Officer Defendants under 42 U.S.C. § 1983, (4) municipal liability for unconstitutional custom or policy against Defendant City of Anaheim under 42 U.S.C. § 1983, (5) violation of Title II of the Americans with Disabilities Act ("ADA") against all Defendants, (6) wrongful death due to negligence by the Officer Defendants under California law, (7) violation of California's Bane Act, Civil Code § 52.1 by the Officer Defendants, (8) assault, (9) battery, and (10) intentional infliction of emotional distress. David Michael also asserts a single claim for (11) negligent infliction of emotional distress. (*See generally* Second Amended Complaint ("SAC"), Doc. 32.)

The events giving rise to this action transpired in two distinct "phases." In the first phase, Officer Defendants Shiao Wang ("Wang") and Kenny Lee ("Lee") responded to a call regarding an alleged assault, and interviewed Perkins as part of their investigation. A

---

[1] The header of each claim indicates that Teresa Perkins asserts the claim only as successor-in-interest to Perkins (*see* SAC ¶¶ 41–101), yet the body of the claims sometimes reflect that she asserts the claim in her individual capacity, (*see, e.g.,* SAC Claim Three for Violation of 14th Amendment Rights/Right to Familial Relationship ¶¶ 53–62). Where relevant, this Order will specify that Teresa Perkins sues on her own behalf.

physical altercation broke out when Perkins threw a punch at one of the officers. Ultimately, Wang and Lee placed Perkins in a chokehold and handcuffed him.  During the second phase, Wang and Lee transferred Perkins to the custody of Officer Defendants Kenneth Edgar ("Edgar") and Ricky Reynoso ("Reynoso").  Edgar and Reynoso, with assistance from Officer Defendant Casey Morrison ("Morrison"), applied a hobble restraint on Perkins.  While in their custody, Perkins stopped breathing.  He was taken to the hospital, where he died a few days later.

Each "phase" is further detailed below.  Unless noted otherwise, the facts set forth herein are undisputed.

### A.  "Phase 1" – Initial Altercation with Wang and Lee

On October 27, 2018, Anaheim Police Department ("APD") Officers Shiao Wang and Kenny Lee responded to a call for service at an apartment building in Anaheim. (Plaintiffs' Revised Statement of Controverted Facts ("SCF"), Doc. 64, ¶ 1.)  Wang and Lee had received a report that a maintenance worker had been assaulted by a resident of the apartment complex.  (*Id.* ¶ 2.)  Once Wang and Lee arrived at the complex, the maintenance worker described a tenant who had walked past him and suddenly punched him in the head.  (*Id.* ¶ 4.)  The maintenance worker identified the alleged assailant as Perkins and requested that the officers arrest him for assault.  (*Id.*)  The apartment complex manager informed Wang and Lee that Perkins lived with family members Lance Perkins and David Michael in apartment A115.  (*Id.* ¶¶ 5–6.)  Wang and Lee proceeded to apartment A115 to conduct an assault and battery investigation.  (*Id.* ¶ 6.)

Footage from body cameras worn by Wang and Lee provides objective video evidence of much, but not all, of what followed.  The two officers knocked and rang the doorbell; Perkins opened the door and informed Wang and Lee, without preamble, that "a guy" had "pushed him" and "gotten angry with him."  ("Lee Cam," Ex. 4 to Lee Decl., Doc. 49 at 1:50–2:20.)  At Wang's request, Perkins provided his ID, confirming his

identity, and informed the officers that he lived in the apartment with his father and uncle. (*See id.* at 2:20–2:40.)  Wang then asked Perkins if he was taking any medications, and Perkins responded that he was taking Depakote for mood stabilization and Zyprexa.  (*Id.* at 2:30–3:20.)  Perkins appeared disoriented throughout the conversation, and, when Wang started questioning him about why he used Zyprexa, he struggled to respond and informed the officers that "the guy" had gone "that way," pointing down the hall.  (*Id.* at 3:00–4:00.) Perkins also kept repeating that he had to "go see his dad."  (*Id.*)  Perkins offered only disoriented responses to Wang's questions about whether his uncle and his father were home, and he seemed increasingly confused by the conversation.  (*See id.*)

About two minutes into the encounter, Wang asked Perkins, "So, what happened?" and Perkins responded, "Those people were chasing me down every day."  (Lee Cam at 4:00–4:30.)  Perkins was fidgeting and occasionally placing his hands near or inside his pockets throughout the conversation; Wang interrupted Perkins's response to ask if he had any weapons on him and told Perkins, "I don't want you to put your hands in your pocket, come on out. I just want to make sure you don't have any weapons on you."  (*Id.*)  Perkins appeared agitated, said "no" repeatedly, and started to close the door.  (*Id.*)  Wang placed a hand on the door, seemingly preventing Perkins from closing it completely, just as Perkins said, "Please don't."  (*Id.*)  Though his feet are not visible in the footage, Wang's testimony confirms he also used his foot to keep the door open.  (Wang Decl., Doc. 47-5 at 4.)

Wang and Perkins continued to converse as Wang held the door partially open. Perkins, apparently disoriented, pointed down the hall and said, "If you want me to tell you, those guys are down there."  (Lee Cam at 4:20–4:40.)  Then, Perkins suddenly appeared alarmed and asked if people were fighting.  (*Id.*)  Wang asked him "What are you talking about? Who's talking to you? Have you taken any medication today?" while Perkins continued to talk about a fight.  (*Id.* at 4:40–5:00.)  Wang then asked Perkins if he

4

was taking any illegal drugs, and requested that Perkins open the door, which he was still holding ajar.  (*Id.*)

At this point, Perkins suddenly threw the door open, ran out, and threw a punch at Wang.  (*Id.* at 5:00–5:20.)  Wang retreated backwards down the hall, deploying his Taser against Perkins as he did so, while Lee apparently tried to restrain Perkins.  (*Id.*)  At this point, Lee's body-worn camera went dark.  However, footage from Wang's body-worn camera shows that Lee tried to restrain Perkins for a few seconds as Wang deployed his Taser again. ("Wang Cam," Ex. 1 to Wang Decl., Doc. 49 at 5:20–5:40.)  Lee was apparently attempting a carotid restraint hold,[2] but Perkins bit off the end of Lee's pinky finger, breaking free of the hold, and Lee was unable to complete the hold.  (*Id.*; *see* SCF ¶¶ 17–18.) Although the action is not always fully in frame, the footage shows that all three proceeded further down the hall as the officers swung at Perkins with their collapsible police batons and fists.  (Wang Cam at 5:20–5:40.)  For the most part, it appears that Perkins struggled against the officers.  (*See id.*)  At one point, Perkins struck Wang, and Lee deployed his Taser against Perkins.  (Wang Cam at 5:40–6:00.)  Lee and Wang continued to hit Perkins as all three reached the stairwell at the end of the hallway, and Perkins fell to the ground.  (*Id.*)  Perkins tried to stand, and both officers grabbed him, telling him to "get down," "stop," and "relax."  (*Id.* at 6:00–6:30; SCF ¶ 23.)  Ultimately, Wang took Perkins to the ground and successfully applied a carotid restraint hold.  (Wang Cam at 6:30–7:20; SCF ¶¶ 23–25.)

The video footage fails to show how long Wang applied the carotid restraint hold or Perkins' medical condition immediately after the hold was applied.  David Michael witnessed this portion of the altercation, and his testimony runs counter to the officers'

---

[2] "In the 'carotid' hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The 'carotid' hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain." *City of L.A. v. Lyons*, 461 U.S. 95, 97 n.1 (1983).

testimony.  All parties state that it took Wang roughly one minute to get into position to apply the carotid hold.  (*See* SCF ¶ 26.)  However, according to the officers' declarations, Wang applied the carotid hold for no more than ten seconds, and let go when Perkins began to snore, which, according to the officers, confirmed effective application of the hold.  (SCF ¶ 27.)  Defendants contend that Lee then applied the handcuffs, and that the officers moved Perkins to a recovery position on his side.  (*Id.* ¶ 27.)  However, David Michael, who was in the hallway at the time and observed this portion of the events, testified that Lee was beating Perkins even as Wang choked him, and that Wang had his arm around Perkins' neck even after Perkins was handcuffed.  Based on this testimony, and the time it took to handcuff Perkins, Plaintiffs conclude that Wang choked Perkins for over a minute. (*See id.* ¶ 27.)  In addition, the officers state that Perkins regained consciousness after they handcuffed him and moved him into a recovery position, while Plaintiffs contend that Perkins was still unconscious two minutes after Wang applied the carotid restraint hold.  (*See id.* ¶ 28.)

## B.  "Phase 2"—Edgar and Reynoso Take Custody

Lee requested paramedics within a few seconds of handcuffing Perkins. (SCF ¶ 29.)  Edgar and Reynoso then took custody of Perkins.  (*Id.* ¶ 29.)  Lee informed them that paramedics had been called and Wang informed them that a carotid restraint hold had been used on Perkins.  (*Id.* ¶¶ 29, 31.)[3]  Reynoso's deposition testimony also confirms that he observed Taser probes on Perkins's body upon arrival, and that he therefore surmised Perkins had been tased.  (Plaintiffs' Statement of Additional Material Facts ¶ 26;

---

[3] It is undisputed that Wang informed Edgar and Reynoso that he applied the carotid hold.  It is also undisputed that when Perkins later stopped breathing in Edgar and Reynoso's custody, and paramedics were summoned to render medical help, Edgar and Reynoso informed them that Perkins had been subject to a carotid hold *and* tased.  (SCF ¶¶ 53–54.)  However, Defendants do not proffer evidence to show whether Wang and Lee ever informed Edgar and Reynoso of the Taser use.  As discussed, the evidence before the Court confirms that Reynoso, at least, surmised that Tasers had been deployed from the probes on Perkins's body.

Reynoso Depo., Ex. E to Lacy Decl., Doc. 55-6, at 60:21–61:8.)  When the officers tried to engage Perkins, he was non-verbal and breathing heavily; Reynoso described him as having a "thousand-yard stare," and Edgar and Reynoso asked for his name, and generally tried to engage him by asking questions, without receiving any response from Perkins. (SCF ¶ 32; *see also* "Edgar Cam," Ex. 5 to Edgar Decl., Doc. 47-2, at 4:00–6:20.)  Edgar interviewed David Michael, who informed Edgar that Perkins was on medication for bipolar disorder and suffered from schizophrenia.  (SCF ¶ 33.)

After taking custody of Perkins, Edgar and Reynoso stood him up and attempted to move him out of the stairwell area.  (SCF ¶¶ 34–36; *see also* Edgar Cam at 8:50–10:00.) Edgar and Reynoso guided Perkins 10–15 feet to the stairs outside the apartment complex before Perkins apparently could not continue further and collapsed.  (SCF ¶¶ 37, 40; Edgar Cam at 8:50–10:00.)  Edgar testified that he believed Perkins was reaching for his (Edgar's) gun when he collapsed, while Plaintiffs contend that Perkins appeared to be steadying himself, not reaching for Edgar's gun.  (*Id.* ¶¶ 38–39.)  Instead of trying to move Perkins further, Edgar and Reynoso directed him to sit where they were.  (*Id.* ¶ 40.) Defendants contend that Perkins continued to resist, even as the officers instructed him to sit, and the officers therefore laid him down on his side.  (*Id.* ¶¶ 40–41.)  According to Edgar and Reynoso, Perkins then rolled onto his stomach and appeared calmer.  (*Id.* ¶ 41.) Plaintiffs contend that, by this point, Perkins was having difficulty breathing and could not control his bodily movements.  (*Id.*)  The video evidence is not conclusive on this point.

At this time, paramedics arrived in the parking lot, (*id.* ¶ 42), and Edgar requested that they retrieve Lee's finger, which had been found nearby.  (*Id.*)  On two occasions, the paramedics walked within a few feet of Perkins without examining him.  (*Id.* ¶ 43.) Defendants did not, at that time, inform the paramedics that Perkins had been subject to Taser applications and a carotid hold.  (*Id.*)

After appearing momentarily calm, Perkins began moving his legs, which the officers interpreted as active resistance.  (SCF ¶ 44.)  A supervisor—not named as a

Defendant here—arrived on the scene and directed Edgar and Reynoso to attach a hobble restraint to prevent Perkins from kicking.  (*Id.* ¶ 45.)  The officers did not inform their supervisor that Perkins had been subject to multiple Taser applications and a successful carotid hold.  (*Id.*)  Ultimately, Edgar and Reynoso, who were joined and assisted by Officer Casey Morrison ("Morrison"), a nearby officer, held Perkins down and applied the hobble restraint on him.  (*Id.* ¶¶ 46–51.)  To hold Perkins in place, Reynoso "leaned his right knee on Perkins right rear-shoulder area."  (*Id.* ¶ 48.)  Defendants contend that Reynoso applied "minimal pressure."  (*Id.*)  Plaintiffs contend that Edgar and Morrison were also applying pressure to Perkins' back and shoulders while applying the restraint. (*Id.* ¶ 51.)  The officers state that they could not apply the restraint quickly because Perkins was moving and stiffening his legs, which Plaintiffs assert were muscular convulsions stemming from the application of the carotid hold.  (*Id.* ¶ 50.)  The process took about two and a half minutes.  (*Id.* ¶ 51.)  Ultimately, once the officers successfully applied the restraint, they rolled Perkins onto his side and discovered that he had lost consciousness. (*Id.* ¶¶ 51–52.)

Reynoso ran to his vehicle to retrieve medical supplies, and the officers began to administer CPR while Perkins was still handcuffed with his hands behind his back. (*Id.* ¶ 52; *see also* David Michael Depo. at 89:4–5.)  Paramedics arrived approximately five minutes later.  (*Id.*)  Edgar informed them that Perkins had been Tased and subjected to a carotid hold.  (*Id.* ¶ 53–54.)  Perkins died in the hospital several days later.  (Mot., Doc. 47, at 16.)   Plaintiffs state that Perkins's cause of death was "asphyxia hypoxic brain injury due to restraint asphyxiation and the manner of death was homicide."  (Plaintiffs' Statement of Additional Material Facts, Doc. 64, ¶ 39.)  Plaintiffs proffer testimony from a medical expert in support of the proposition that Perkins suffered "a lethal chain of restraint asphyxial events."  (Omalu Depo., Ex. J to Lacy Decl., Doc. 56, at 75:8–11.) That is, the expert testified that the cumulative impact of the Tasers, the blows to Perkins's head, the carotid restraint, and the positional pressure to Perkins's back caused an

irreversible asphyxial brain injury.  (*Id.* at 69:7–14; 77:6–11.)  Defendants state, in their Motion, that Perkins was diagnosed with cardiac arrest at the hospital, but provide no specific evidence about Perkins's cause of death.  (Mot. at 5.)

### C.  Police Procedures

Plaintiffs submit portions of the transcripts from depositions of Edgar, Morrison, Reynoso, and Wang, as well as ADP's policies and manuals, to show that officers are trained (1) not to apply the carotid restraint for more than 30 seconds because it may impair the subject's ability to breathe; (2) not to attempt the hold multiple times within a 24-hour period; (3) to assess the subject's vital signs and immediately begin CPR and establish an airway if necessary if vital signs are not present; and (4) to deem the situation a "medical emergency" if the subject does not regain full consciousness after 30 seconds. (*See* Plaintiffs' Statement of Additional Material Facts ¶ 7.)

According to the Anaheim Police Department ("ADP") Policy Manual on "Use of Force," officers who have applied carotid restraint holds should ensure that the recipient is "promptly examined by paramedics" and should monitor the recipient "until examined by paramedics or other appropriate medical personnel."  (Policy Manual on "Use of Force," Ex. N to Lacy Decl., Doc. 57-3, at 5.)

ADP Policy instructs officers that multiple Taser applications "should be avoided unless the need outweighs the high risk of injury to the suspect," and that officers should notify "supervisors and medics of any use of a Taser." (Plaintiffs' Statement of Additional Material Facts ¶ 8.)  Furthermore, officers are advised not to deploy a Taser against a single subject more than once unless they reasonably believe that the need to control the individual outweighs the potentially increased risk posed by multiple applications.  (Policy Manual on "Conducted Electrical Weapon," Ex. P to Lacy Decl., Doc. 57-5, at 4.)  Lastly, the officers' Training Sergeant should ensure that training includes "[r]estraint techniques that do not impair respiration following the application of the TASER device." (*Id.* at 7;

Plaintiffs' Statement of Additional Material Facts ¶ 12.)  Officers are trained to place the victim of a carotid hold in a safe position and monitor them closely until they receive medical attention.  (Plaintiffs' Statement of Additional Material Facts ¶ 8.)  In their Reply, Defendants did not dispute Plaintiffs' proffered facts regarding officer training and police procedures, nor did they put forward rebuttal evidence on this topic.

## II.   <u>LEGAL STANDARD</u>

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.  But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  "The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage," but the Court discredits a party's version of the facts that is "blatantly contradicted by the video evidence."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–80)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact.  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'"  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

### III.   <u>DISCUSSION</u>

Subsections A–C below consider Plaintiffs' Section 1983 claims for excessive force, denial of medical care, and loss of familial relations against Officer Defendants Lee, Wang, Edgar, and Reynoso.  Subsection D separately considers those claims against Defendant Morrison, an officer who arrived on the scene after Edgar and Reynoso had taken custody of Perkins.  Subsections E and F consider the *Monell* claim against the City of Anaheim, and the ADA claim against all Defendants, respectively.  Finally, Subsection G addresses the various state-law claims against all Defendants.

### A.  Fourth Amendment - Excessive Force

Plaintiffs' first claim is brought against the Officer Defendants under 42 U.S.C. § 1983 ("Section 1983") for use of excessive force in violation of the Fourth Amendment. (*See* SAC ¶¶ 41–46.)  The Fourth Amendment protects all persons from the use of excessive force during an arrest, detention, or other seizure.  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *Graham v. Connor*, 490 U.S. 386, 395 (1989); U.S. Const. amend. IV. Section 1983, in turn, permits citizens to bring civil actions against public employees, like the Officer Defendants here, for violation of constitutional rights.  *See Baker v. McCollan*, 443 U.S. 137, 146 (1979).  However, the qualified immunity doctrine limits such actions to those where the constitutional right was clearly established at the time of the violation.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In examining a claim of excessive force, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" to determine whether the officer's conduct was "objectively reasonable." *Graham,* 490 U.S. at 396. The strength of the government's interest is measured by examining three primary factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Yet, rather than mechanically marching through these nonexhaustive factors, the Court should "examine the totality of the circumstances, including whatever factors may be relevant in a particular case." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174–75 (9th Cir. 2012). A court should examine an officer's use of force based on the "perspective of a reasonable officer on the scene" and avoid post-hoc judgments based on the benefit of hindsight. *Graham*, 490 U.S. at 396.

Defendants argue that they are entitled to qualified immunity. (Mot. at 11–13.) The resolution of a qualified immunity defense turns on two questions: (1) whether, taken in the light most favorable to the party asserting the injury, the facts show the officer's conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the officer's conduct. *Saucier*, 533 U.S. at 201. "This sequence is the analytically logical way to proceed, but [courts] have discretion to decide the second question first, thereby avoiding the first question." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

As discussed above, the alleged unconstitutional conduct occurred in two "phases": (1) Perkins' altercation with Lee and Wang; and (2) the conduct of Edgar, Morrison, and Reynoso after taking custody of Perkins. The Court addresses these phases in turn.

### 1.  "Phase 1" - Lee and Wang

For the reasons below, the Court finds that there exist factual disputes about whether Lee and Wang's use of force was unconstitutional and that, viewing the facts in the light most favorable to Plaintiffs, Lee and Wang's use of force after Perkins fell to the ground violated clearly established constitutional law.

### i.    Excessive Force

Plaintiffs first claim that Lee and Wang's use of batons and Tasers was unreasonable under the circumstances.  As Plaintiffs note, "TASER deployments are not generally considered lethal applications of force, [but] they have long since been considered to be significant levels of intermediate force capable of causing extreme pain and should not be used against a *non-combative* suspect."  (Opp. at 20 (citing *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (emphasis added)).)  Here, however, it is undisputed that Perkins was the first aggressor[4]—the video evidence shows that Lee and Wang were standing in the doorway and questioning Perkins when Perkins flung the door open and threw a punch at Wang.  (Lee Cam at 5:00–5:20.)  Lee attempted to use a chokehold to subdue Perkins after the initial attack, but Perkins bit Lee's finger off.  (SCF

_____

[4] Plaintiffs also contend that "Defendants Wang and Lee knew they were not supposed to cross the threshold of Justin's front door without probable cause or exigent circumstances, but Wang took it upon himself and did it anyway[.]"  (Opp. at 16.)  Plaintiffs seem to argue that Wang's intrusion into Perkins's apartment, without probable cause or exigency, constituted a Fourth Amendment violation.  But Plaintiffs cite to no authority for the proposition that such an intrusion renders an officer's subsequent use of force in self-defense unreasonable.  Indeed, "[f]ederal law [] generally focuses on the tactical conduct at the time of [the use of force]."  *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021).  The Court will more closely consider the officers' pre-use-of-force conduct in the context of Plaintiffs' wrongful death claim under California law in Section III. G, *infra*.  *See id.* ("Under California law, the officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly force at the moment of shooting might be reasonable in isolation.").  However, evidence that Wang held the door to Perkins's apartment open with his foot does not, without more, change the excessive force inquiry here.

13

¶¶ 17–18.)  Lee and Wang both deployed their Taser against Perkins and both officers beat Perkins with their fists and batons.  (*Id.* ¶¶ 16–19.)

Plaintiffs contend that, after throwing the initial punch, Perkins was attempting to shield himself, not harm the officers.  (David Michael Depo., Ex. M to Lacy Decl., Doc. 57-2, at 72:13–16.)  While the video evidence is inconclusive as to *the extent* to which Perkins was resisting throughout the altercation, it makes clear that Perkins was not subdued, and that the officers could not restrain or handcuff Perkins.  The video evidence also shows that Perkins struck Wang at least once after the initial punch as the officers struggled with him in the hallway.  (Wang Cam at 5:40–6:00.)  Moreover, the situation was evolving quickly.  The altercation— from the time Perkins threw a punch to when Lee and Wang handcuffed him—lasted a little over two minutes.  There was no break in the activity or opportunity for the officers to deliberate.

Nonetheless, the use of force did not end with the deployment of Tasers and batons.  The Ninth Circuit has "applied *Graham* to hold that a triable issue of fact exists as to excessive force if, viewing the evidence in the light most favorable to the plaintiff, it appears that officers use excessive force on an arrestee after he or she has surrendered, or is otherwise helpless, and is under complete control of the officers."  *Barnard v. Las Vegas Metro. Police Dep't* ("*Barnard I*"), 310 F. App'x 990, 992 (9th Cir. 2009) (citing *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir.2000)).

Here, a reasonable jury could conclude that the facts, taken in the light most favorable to Plaintiffs, establish that Lee and Wang used unreasonable force.  While the video evidence shows much of the struggle between Perkins and the officers in the hallway, it does not clearly depict whether Perkins was resisting once he was knocked down.  David Michael—a percipient witness—contends that Lee continued to beat Perkins as Wang choked him.  He also contends that Wang had his arms around Perkins's neck even as Lee, with David Michael's help, handcuffed Perkins.  (*See* David Michael Depo., Ex. M to Lacy Decl., Doc. 57-2, at 55:20–56:16.)  And, according to Plaintiffs, it appeared

1    that Wang applied the chokehold for close to a minute.  (*Id.* at 77:10–17; Wang Cam at

2    5:59–7:41.)  Moreover, while the video evidence does not show whether Perkins was

3    struggling, it does confirm that Wang applied the carotid chokehold *after* Perkins was on

4    the ground.  (Wang Cam at 5:59–7:41.)  Thus, when Wang applied the carotid hold, the

5    officers had gained a tactical advantage over Perkins.  While Wang contends that he

6    applied the chokehold for only 10 seconds, "credibility determinations, the weighing of

7    evidence, and the drawing of legitimate inferences from the facts are jury functions, not

8    those of a judge."  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013).

9         In sum, a reasonable jury could find that use of the chokehold—specifically,

10   Wang's use of the chokehold for longer than the recommended duration and Lee's

11   assistance and purported beating of Perkins as Wang applied the hold—was unreasonably

12   excessive under the circumstances.

13

14                          **ii.    Qualified Immunity**

15        Moreover, viewing the facts in the light most favorable to Plaintiffs, Lee and

16   Wang's use of force after Perkins fell to the ground violated clearly established

17   constitutional law.  As Plaintiffs correctly note, the Ninth Circuit has held that "using the

18   carotid restraint on a person who is not resisting officers violates the Fourth Amendment."

19   (Opp. at 20 (quoting *Tuuamalemalo*, 946 F.3d at 477).)[5]  In *Drummond ex rel. Drummond*

20   *v. City of Anaheim*, the Ninth Circuit held that the officers were not entitled to qualified

21   immunity when they "pressed their weight onto [the suspect's] neck and torso, and

22   maintained that pressure for a significant period of time" after the suspect was already

23   subdued and handcuffed.  343 F.3d 1052, 1063 (9th Cir. 2003).  The court reasoned that

24   ────────────────────

25        [5] The relevant inquiry is whether the violation was clearly established at the time of the
     incident.  *Tuuamalemalo* was issued about a year after Perkins's death but is relevant to the extent
26   it confirmed that the Ninth Circuit's earlier decisions in *Drummond ex rel. Drummond v. City of*
     *Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) and *Barnard v. Theobald* ("*Barnard II*"), 721 F.3d
27   1069 (9th Cir. 2013) clearly established that use of a chokehold on a non-resisting person is
     unconstitutional.
28

                                        15

the defendant officers were on notice—through case law, police training materials, and the arrestee's behavior—that pressing their weight on the arrestee's neck and torso could lead to asphyxia, and that their application of such force against a non-resisting arrestee was therefore unreasonable. *Id.* at 1062.

Here, it is undisputed that Lee and Wang were trained to refrain from using the carotid restraint for more than 30 seconds because doing so may impair the subject's ability to breathe. (*See* Plaintiffs' Statement of Additional Material Facts ¶ 7); *see also Drummond*, 343 F.3d at 1062 (police training materials are relevant to whether reasonable officers would be on notice that the force employed was objectively unreasonable). And, in light of Ninth Circuit case law, the officers were on notice that continuing to apply potentially lethal force against a restrained and non-resisting arrestee violates the Fourth Amendment. *See Drummond*, 343 F.3d at 1062–63; *see also Barnard v. Theobald* ("*Barnard II*"), 721 F.3d 1076 (9th Cir. 2013) (affirming the jury's finding that the officers used unreasonable force when they placed the non-resisting, restrained plaintiff in a chokehold and then pepper sprayed him).

Perkins's status as first aggressor does not change the qualified immunity analysis, as Defendants suggest it should in their brief. (Mot. at 12 ("the qualified immunity inquiry must consider [the] use of force from the perspective of officers who were under attack, were essentially losing a fight against a strong aggressor, and sustained injuries that would continue to place them at a disadvantage").) The Ninth Circuit's decision in *LaLonde* is instructive on this point. There, the officer defendants were warned prior to the arrest that the arrestee was potentially dangerous and owned a rifle; they resorted to force only after the arrestee became uncooperative and belligerent; and the arrestee admitted to resisting the officers during arrest. *LaLonde*, 204 F.3d at 959. While handcuffing the arrestee, one officer allegedly "forcefully put his knee" into the arrestee's back, causing him significant pain at the time of arrest and a continuing back injury afterwards. *Id.* The Ninth Circuit reversed the district court's judgment as a matter of law in favor of the officers, holding

16

that if the extent of the back injury was serious enough, a jury could reasonably conclude that the officer used force in excess of what was reasonable. *Id.*

In sum, the Court finds that, at the time of the incident, a reasonable officer would have been aware that when "[an] arrestee has surrendered, or is otherwise helpless, and is under complete control of the officers," applying a chokehold on that arrestee for a significant period, and beating him, violates the Fourth Amendment. *See Barnard I*, 310 F. App'x at 993 (holding that, after *LaLonde*, it was clearly established that using a chokehold on a non-resisting arrestee who had surrendered, pepper-spray him, and applying excessive pressure on his neck and back constituted excessive force).

### 2.  "Phase 2" - Edgar and Reynoso

Defendants also argue that Edgar and Reynoso are entitled to summary judgment on the use of excessive force claim because they used only minimal force in applying pressure to Perkins's back and applying the hobble restraint, and they immediately commenced emergency first aid once they observed that Perkins had lost consciousness.  (Mot. at 8.) Plaintiffs counter that "[a] reasonable fact-finder could conclude that the officers' use of body compression as a means of restraint was unreasonable and unjustified by any threat of harm or escape when [Perkins] was handcuffed, in a prone position, and surrounded by numerous officers," and they contend the constitutional violation was clearly established. (Opp. at 19 (citing *Drummond*, 343 F.3d at 1056; *Abston v. City of Merced*, 506 F. App'x 650, 652-653 (9th Cir. 2013); *Zelaya v. Las Vegas Metro. Police Dept.*, 682 F. App'x 565 (9th Cir. 2017); *Slater v. Deasey*, 789 F. App'x 17, 19 (9th Cir. 2019)).)

### i.     Excessive Force

Plaintiffs have raised triable issues of fact about whether Edgar and Reynoso used unreasonable force.

17

When Edgar and Reynoso took custody of Perkins, he was handcuffed.  (SCF ¶ 27.) Moreover, it is undisputed that Wang put Edgar and Reynoso on notice that Perkins had been subjected to a carotid chokehold.  (*Id.* ¶ 31.)   And the evidence before the Court confirms that, when Edgar and Reynoso took custody, the probes from the Tasers were still protruding form Perkins's body—Reynoso confirmed, in deposition, that he noticed them and surmised that Perkins had been tased.  (*See* Reynoso Depo. at 60:21–61:8.)  Moreover, the video evidence shows that Perkins was breathing heavily, had blood on his face, and seemed disoriented.  Indeed, Edgar and Reynoso asked his name with no response. (Edgard Cam at 4:40–6:05.)  Reynoso and Edgar got Perkins to his feet and tried to walk him out of the stairwell.  But the video evidence shows that Perkins either fell or sat down after walking a few feet.  In short, Perkins was restrained, in custody, and in a weakened state.  A jury could reasonably conclude that any danger previously posed by Perkins had subsided.

Per the ADP "Use of Force" manual, the officers should have ensured that Perkins was examined by paramedics on the scene and applied appropriate medical interventions in the interim, including placing him in recovery position and monitoring him closely.  (*See* Plaintiffs' Statement of Additional Material Facts ¶ 7.)  Instead, Edgar and Reynoso left Perkins lying on the ground, and, when he appeared agitated, applied pressure against his back in order to pin him down and place a hobble restraint on his legs.  (SCF ¶¶ 48–51.) Defendants do not dispute that Reynoso placed his knee on Perkins's back, nor do they dispute Plaintiffs' evidence that Edgar helped pin Perkins down.  (*Id.* ¶¶ 48, 51.)  But they contend that Reynoso applied only minimal pressure on Perkins's shoulder area and did not apply any pressure to Perkins's neck or lung area.  However, such credibility determinations are for the jury, not the Court, to make.

Defendants concede that "[t]he threat to the safety of the officers was not extreme," during this phase, but they contend "it was reasonable for [the officers] to restrain Perkins" because he became agitated and combative.  (Mot. at 9–10.)  Specifically, Defendants state

that, before falling to the ground, Perkins grabbed at both Edgar and Reynoso with his handcuffed hands, and that Perkins specifically "used his handcuffed hands to grab at his belt area where [Edgar] keeps his gun." (SCF ¶ 39.)  They also contend that, once on the ground, Perkins was briefly calm but eventually started to kick and grab at Edgar and Reynoso, and that they had to restrain Perkins's legs to prevent him from kicking the officers or arising to flee.  (*Id.* ¶¶ 44–50.)  From the video, however, a jury could determine that Perkins was simply moving because he was in distress and did not grab at the officers or attempt to reach for Edgar's gun.  Moreover, Defendants do not dispute that Edgar and Reynoso were able to hold Perkins's legs down to stop the kicking prior to application of the hobble restraint.  (*Id.* ¶ 45.)  Thus, any threat that Perkins would harm them, or flee from the scene, was not immediate.

It is also undisputed that Edgar and Reynoso were on notice that Perkins had been subjected to a carotid hold, and that he had been tased.  (*Id.* ¶¶ 31, 53; Plaintiffs' Statement of Additional Material Facts ¶ 26.)  And the purportedly combative behavior that caused Edgar and Reynoso to pin Perkins down started after Perkins had been in their custody for several minutes and after paramedics had already arrived on the scene.  Edgar and Reynoso were aware of police procedures requiring them to have Perkins examined by paramedics and monitor Perkins closely.  (*See* Plaintiffs' Statement of Additional Material Facts ¶ 7.)  The facts are susceptible to the interpretation that had Edgar and Reynoso informed the paramedics of his condition, Perkins's agitated episode could have been avoided altogether.

Thus, a reasonable jury could find that Edgar and Reynoso should have used less forceful means of restraining Perkins because he had been beaten, tased, and subjected to a carotid hold, and because the threat he posed to the officers, if any, was not immediate. Plaintiffs have raised triable issues of fact material to whether Edgar and Reynoso used unreasonable force.

### ii.   Qualified Immunity

"Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual in an agitated state' can cause suffocation 'under the weight of restraining officers,' therefore, such conduct may be considered deadly force." *Garlick v. Cnty. Of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016) (citing *Drummond*, 343 F.3d at 1056–57; *Arce v. Blackwell*, 294 F. App'x 259, *1–2 (9th Cir. 2008)).  The Court finds that, at the time of the incident, reasonable officers would have been aware that applying force against a restrained detainee who is potentially in medical distress violated the rule established in *Drummond* and its progeny. *Drummond*, 343 F.3d at 1056.  As discussed above, in *Drummond*, the Ninth Circuit held that the officers' conduct violated the Fourth Amendment, in part because pressing weight on an arrestee's "neck and torso as he lay handcuffed on the ground and begged for air" was "severe and, under the circumstances, capable of causing death or serious injury." *See* 343 F.3d at 1056–57; *see also Zelaya*, 682 F. App'x 565 ("It was thus clearly established that continuing to press weight onto a detainee for a significant period of time after the detainee is subdued violates the Fourth Amendment.").

Defendants attempt to distinguish the instant case from *Drummond*, arguing that in *Drummond*, the arrestee had not committed a crime, was not a danger to himself or others, did not offer resistance, and repeatedly complained that he could not breathe. (Mot. at 9 (citing *Drummond*, 343 F.3d at 1054–55).)  Defendants argue the facts of this case are more similar to *Tatum*, where the Ninth Circuit found that it was "objectively reasonable to use a control hold on the subject's arm in order to handcuff him" when the arrestee was behaving erratically and resisting arrest.  (Mot. at 10 (citing *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1095, 1097 (9th Cir. 2006)).)  But, unlike in *Tatum*, Edgar and Reynoso used force against an arrestee who was already handcuffed and who had been subjected to significant force during the arrest.  And, at the time of the incident, Ninth Circuit precedent was clear: "Resistance, or the reasonable perception of resistance, does not entitle police

officers to use *any* amount of force to restrain a suspect. Rather, police officers who confront actual (or perceived) resistance are only permitted to use an amount of force that is *reasonable* to overcome that resistance."  *Barnard II*, 721 F.3d at 1076 (internal citations omitted) (emphasis in original); *Abston*, 506 F. App'x at 652–53 (use of body compression on a prone and bound suspect, who was in no position to offer any *meaningful resistance*, would violate the rule established by *Drummond*).

In sum, the facts, when viewed in the light most favorable to Plaintiffs, were sufficiently analogous to the *Drummond* line of cases to put Edgar and Reynoso on notice that their use of force violated the Fourth Amendment.

Accordingly, summary judgment is DENIED as to Plaintiffs' excessive force claim against Lee, Wang, Edgar, and Reynoso.

## B.  Fourteenth Amendment - Denial of Medical Care

Plaintiffs' second claim is for denial of medical care in violation of the Fourteenth Amendment, which protects individuals against government officials' deliberate indifference to their safety—including their serious medical needs.  *Penilla ex rel. Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997).   Specifically, if "affirmative conduct on the part of the state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983." *Id*. at 710.

"[C]laims for violations of the right to adequate medical care . . . must be evaluated under an objective deliberate indifference standard."  *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).  The Ninth Circuit has held that deliberate indifference "may appear when [officials] deny, delay or intentionally interfere with medical treatment[.]"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  The elements of a deliberate indifference claim under the Fourteenth Amendment are: "(i) the defendant made an intentional decision with respect to [plaintiff's condition]; (ii) those conditions put

the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (citing *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016). "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case.'" *Id.* (internal citations and quotation marks omitted).

Defendants argue that the Officer Defendants "met, and likely exceeded, their constitutional obligations with respect to Perkins' medical care" by immediately requesting paramedics after Perkins had been subjected to a carotid hold, continuously monitoring him after he had been handcuffed, and quickly applying emergency aid after Perkins had fallen unconscious.  (Mot. at 13–14 (citing *Tatum*, 441 F.3d at 1099).)  They also contend that Perkins was actively resisting while Officers Edgar and Reynoso had him in their custody and that "nothing would have suggested to a reasonable officer that Perkins was in an elevated level of medical distress."  (*Id.* at 14.)  Plaintiffs counter that the officers did not meet their constitutional obligations because they failed to direct the first group of paramedics on the scene to attend to Perkins when he was "in obvious need of medical care," and because they exacerbated his medical distress by applying the hobble restraint to Perkins "while he was not moving and turning blue."  (Opp. at 22 (citing *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244–45 (1983)).)

### 1.     Lee and Wang

When "affirmative conduct on the part of the state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983." *Penilla*, 115 F.3d at 710 (9th Cir. 1997).

1    Plaintiffs have proffered evidence to show that Perkins needed medical attention as

2    a result of Lee and Wang's use of force, (Omalu Depo. at 69:7–14; 77:6–11), however,

3    they fail to proffer evidence to show Lee and Wang prevented or delayed Perkins's access

4    to medical care.  Rather, the undisputed evidence indicates that Lee and Wang took

5    reasonable available measures to abate the risk created by their conduct.  *See Gordon*, 888

6    F.3d at 1125.  After handcuffing Perkins, Lee called paramedics to the scene.  (SCF ¶ 29.)

7    Lee informed Edgar and Reynoso that paramedics had been called and Wang informed

8    them that a carotid restraint hold had been used on Perkins.  (*Id.* ¶¶ 29, 31.)  Plaintiffs do

9    not dispute these facts.  Nor do they present any evidence to show that, despite calling the

10   paramedics, Lee and Wang impeded Perkins's access to medical care.

11   Accordingly, summary judgment is GRANTED as to Plaintiffs' denial of medical

12   care claim against Lee and Wang.

### 2.    Edgar and Reynoso

15   As discussed below, Plaintiffs have raised triable facts about whether Edgar and

16   Reynoso's conduct violated the objective deliberate indifference test set forth in *Gordon v.*

17   *County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).  Moreover, the violation was

18   clearly established at the time of the incident.

### i.    Deliberate Indifference

20   The undisputed evidence tends to show that Edgar and Reynoso were on notice that

21   Perkins required medical assistance.  Wang informed Edgar and Reynoso that Perkins had

22   been subjected to a carotid hold.  (SCF ¶ 29.)  The officers also observed that Perkins was

23   struggling to walk, unresponsive, bleeding from his face, and experiencing labored

24   breathing.  (*See* Edgar Cam at 4:00–6:20.)  The Court is therefore unpersuaded by

25   Defendants' contention that "nothing would have suggested to a reasonable officer that

26   Perkins was in an elevated level of medical distress."  (Mot. at 14.)  The ADP "Use of

27   Force" manual also trained officers that an arrestee subjected to a carotid hold should be

28

23

closely monitored and examined by medical professionals.  (*See* Plaintiffs' Statement of Additional Material Facts ¶ 7.)  Moreover, the officers were trained to summon medical help if a Taser is deployed.  (Reynoso Depo. at 38:12–15.)  A reasonable jury could find that Edgar and Reynoso should have appreciated that their failure to procure medical assistance for Perkins would heighten the risk of medical complication.  *Gordon*, 888 F.3d at 1125.

The undisputed evidence also shows that Edgar and Reynoso made "deliberate decision[s]" about Perkins's condition and did not take "reasonable available measures to abate [the risk of harm]."  *See id.*  Defendants do not dispute that Edgar and Reynoso allowed paramedics to walk past without requesting that they examine Perkins, but they state that Edgar and Reynoso reasonably believed the paramedics were making an informed decision to prioritize Lee's injury.  (SCF ¶ 43.)  But "claims for violations of the right to adequate medical care brought by [] detainees against individual defendants under the Fourteenth Amendment must be evaluated under an *objective deliberate indifference* standard."  *Gordon*, 888 F.3d at 1124–25 (internal citations and quotation marks omitted) (emphasis added).  It is undisputed that Edgar and Reynoso did not inform the paramedics that Perkins had been subjected to a carotid restraint; thus, the paramedics did not possess all the relevant information in determining which patient to prioritize.  A reasonable jury could conclude that Edgar and Reynoso's failure to direct paramedics to examine Perkins was objectively unreasonable.

In sum, the Court concludes that Edgar and Reynoso are not entitled to summary judgment on the basis that they were not deliberately indifferent as a matter of law.  Given their awareness of Perkins's condition, and their failure to direct paramedics to provide Perkins medical care—or to inform them of his condition when they arrived on the scene—the evidence is susceptible to the interpretation that Edgar and Reynoso acted with deliberate indifference.  Thus, the question of whether Edgar and Reynoso's actions unconstitutionally denied Perkins medical care must go to the jury.

1

2                              **ii.    Qualified Immunity**

3          The Court also finds that the law on denial of medical care was clearly established

4    at the time of the incident.  The Ninth Circuit has held that "due process requires that

5    police officers seek the necessary medical attention for a detainee when he or she has been

6    injured while being apprehended by *either promptly summoning the necessary medical*

7    *help or by taking the injured detainee to a hospital*."  *Maddox v. City of L.A.*, 792 F.2d

8    1408, 1415 (9th Cir. 1986) (emphasis added).  Edgar and Reynoso were on notice that

9    "[deliberate indifference] may appear when [police officers] deny, delay or intentionally

10   interfere with medical treatment [.]'" *Jett*, 439 F.3d at 1096 (citations omitted); *Maxwell v.*

11   *Cnty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013) (officers were deliberately

12   indifferent to a gun-shot victim's medical needs because "[i]t was obvious that delaying a

13   bleeding gun-shot victim's ambulance increased the risk of death").

14         As discussed above, a jury could find that Perkins's medical need was readily

15   apparent and that Edgar and Reynoso acted with deliberate indifference when they initially

16   failed to summon medical help for him and failed to inform the paramedics on the scene of

17   his condition.  Edgar and Reynoso are not entitled to qualified immunity because, if

18   Plaintiffs' version of the facts prevails at trial, the jury could find they acted with

19   deliberate indifference, and "a finding of deliberate indifference necessarily precludes a

20   finding of qualified immunity." *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992),

21   *overruled in part on other grounds as recognized in Snow v. McDaniel*, 681 F.3d 978, 986

22   (9th Cir. 2012).

23         Accordingly, summary judgment is DENIED as to Plaintiffs' denial of medical care

24   claim against Edgar and Reynoso.

25

26

27

28

### C. Fourteenth Amendment - Loss of Familial Relationship

Plaintiffs' third claim asserts that the Officer Defendants unconstitutionally interfered with Plaintiff Teresa Perkins's interest in a familial relationship with her son. "[P]arents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). As such, "official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Id.* (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). There are two standards for such a claim, depending on the ability of an officer to deliberate on the situation. If "actual deliberation by an officer is practical, then an officer's '*deliberate indifference*' may suffice to shock the conscience." *Id.* (emphasis added). Conversely, "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts *with a purpose to harm unrelated to legitimate law enforcement objectives*." *Id.* (emphasis added)*.* The same standard applies in scenarios involving "repeated split-second decisions," where "evasive actions" by a suspect require officers to act quickly— such as minutes-long altercations where officers must adapt to the situation quickly. *See Porter*, 546 F.3d at 1139. A "purpose to harm" exists where officers' actions can be reasonably construed as "punishing or harassing." *Id.* at 1142.

#### 1. Wang and Lee

Defendants argue that Wang and Lee lacked time to deliberate on the matter at hand, and, therefore, should be subject to the "purpose to harm" standard. (Mot. at 16 (citing *Porter*, 546 F.3d at 1142).) The Court agrees. The altercation—lasting from when Perkins lunged at the officers in his doorway until Wang successfully applied the carotid hold—lasted roughly two and a half minutes. (*See* Wang Cam at 5:00–7:30.) This is precisely the type of "fast paced, evolving situation" anticipated by the Ninth Circuit in

*Porter*.  *See Porter*, 546 F.3d at 1142.  Thus, Lee and Wang can be held liable under a substantive due process theory only if they "acted with a purpose to harm [Perkins] for reasons unrelated to legitimate law enforcement objectives."  *Id.* at 1137.  Plaintiffs argue that Wang and Lee's conduct was conscience-shocking because they applied the carotid hold despite Perkins "stumbling through the hallway and falling to the ground dazed and confused."  (Opp. at 23.)  However, Plaintiffs have presented no "specific, non-conclusory" evidence to establish improper motive.  *See Shirar v. Guerrero*, 673 F. App'x 673, 675 (9th Cir. 2016) (citing *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001)).  As such, there is no genuine dispute of fact as to whether the officers acted with a purpose outside of legitimate law enforcement objectives.  *See Jeffers,* 267 F.3d at 907.

### 2.      Edgar and Reynoso

When Edgar and Reynoso took custody, Perkins was handcuffed and no longer posed any immediate threat to the officers.  Thus, the "deliberate indifference" standard applies.  This is the same substantive due process standard governing Plaintiffs' denial of medical care claim.  For substantially the same reasons set forth in that discussion, (Section III. B, *supra*), Defendants are not entitled to summary judgment on the loss of familial relations claim against Edgar and Reynoso.  Specifically, a reasonable trier of fact could conclude that, because Edgar and Reynoso were on notice that Perkins needed medical assistance, their failure to affirmatively direct paramedics to attend to Perkins and their subsequent use of force on Perkins's back amounts to deliberate indifference in violation of the Fourteenth Amendment's due process clause.

In sum, summary judgment is GRANTED as to Wang and Lee and DENIED as to Edgar and Reynoso on Plaintiffs' loss of familial relationship claim.

1

### D.  Section 1983 Claims Against Morrison

Plaintiffs also assert their first three claims—that is the Section 1983 claims for excessive force, denial of medical care, and loss of familial relations, which were discussed above—against Officer Casey Morrison ("Morrison").  However, Plaintiffs fail to raise triable issues of fact about whether Morrison committed constitutional violations. Indeed, Plaintiffs, in their briefing and statement of facts, make few references specific to Morrison.  It is undisputed that Morrison, who was nearby at the time of the incident, arrived on the scene and assisted Edgar and Reynoso in applying the hobble restraint. (SCF ¶ 46.)  Morrison testifies, and his bodycam footage confirms, that after he arrived at the apartment complex, he was attaching caution tape on an exterior staircase when he observed that Perkins was resisting Edgar and Reynoso.  (Morrison Decl., Doc. 47-1, ¶¶ 3– 5; *see also* "Morrison Cam," Ex. 7 to Morrison Decl., Doc. 47-1, at 0:00–3:12.)  Morrison then approached to assist Edgar and Reynoso and was instructed to restrain Perkins' legs with a hobble device.  (Morrison Decl. ¶ 5; Morrison Cam at 3:10–3:15.)

However, Plaintiffs put forth no evidence to show Morrison's assistance with the hobble restraint was unreasonable when viewed from the perspective of a reasonable officer in Morrison's position.  While Edgar and Reynoso were on notice that Perkins had been subjected to a carotid hold, Plaintiffs put forth no evidence to suggest that *Morrison* was informed of Perkins's condition.  Nor does the evidence before the Court support such a conclusion.  The footage from Morrison's body-camera shows that, when Morrison arrived on the scene and walked past to apply caution tape to the stairwell, Perkins lying on his side and Edgar and Reynoso were holding his legs down. (Edgar Cam at 1:40–2:00.) One of the officers informed Morrison that they had tried to walk Perkins out, but had managed to walk him only so far before Perkins had resisted.  (*Id*.)  But nowhere in the footage before the Court do Edgar and Reynoso inform Morrison that Perkins was non-responsive and that he had been subject to a carotid hold and Taser applications.  In sum, the undisputed evidence before the Court tends to show that Morrison was not aware of

28

Perkins's medical needs, and Plaintiffs have proffered no evidence or analysis to the contrary.

Plaintiffs state that Edgar, Reynoso, and Morrison "all had hands and/or knees on [Perkins's] back and shoulders" when applying the restraint.  (SCF ¶ 51.)  However, Plaintiffs cite to no footage supporting this assertion as to Morrison.  And the cited portion of Morrison's deposition testimony does not support Plaintiffs' assertion.  Rather, the cited testimony confirms only that Morrison was generally trained that holding someone in a particular position of restraint may compromise their ability to breathe.  (*See id.* (citing Morrison Depo, Ex. T to Lacy Decl., Doc. 57-9, at 24:1–8).)  Moreover, in a declaration submitted in support of summary judgment, Morrison testifies that he "remained positioned at Perkins' lower extremities, with other officers closer to his torso and shoulders."  (Morrison Decl. ¶ 7.)  The video footage also confirms that Morrison helped apply the hobble restraint to Perkins's *legs*, but apparently did not apply pressure to Perkins's back or shoulders, as Plaintiffs contend.  (Morrison Cam at 4:00–5:00.)  Plaintiffs offer no evidence that Morrison's manipulation of Perkins's legs into the restraint, without more, constitutes excessive force.  Nor do Plaintiffs offer legal authority or analysis in support of the proposition that, when viewed from the perspective of a reasonable officer in Morrison's position, application of the restraint to Perkins's legs was unreasonable.

Accordingly, Morrison is entitled to summary judgment on Plaintiffs' excessive force claim because Plaintiffs have failed to proffer evidence to establish that Morrison used excessive force against Perkins.  Moreover, because Plaintiffs do not contend Morrison was aware of Perkins's condition, there exist no triable issues of fact as to whether Morrison acted with deliberate indifference towards Perkins by failing to procure medical help for him.

### E.  *Monell* Claim

Plaintiffs' fourth claim is a Section 1983 claim against the City for failure to properly train and for maintaining an unconstitutional custom, practice, or policy.

Section 1983 claims brought against a governmental entity under a theory of *respondeat superior* are known as *Monell* claims.  *See Thompson v. City of L.A.*, 885 F.2d 1439, 1443 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of S.F.*, 595 F.3d 964 (9th Cir. 2010).  A plaintiff may prevail on his *Monell* claims only if he "establishes that his injuries were inflicted pursuant to an official [city] policy or custom." *Thompson*, 885 F.2d at 1443.

Plaintiffs have not provided evidence of any unconstitutional City custom or policy. In fact, in their briefing, Plaintiffs do not attempt to address Defendants' *Monell* argument. Therefore, Plaintiffs have abandoned these claims.  *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Plaintiff abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment.").  Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' fourth claim.

### F.  ADA Claim

Plaintiffs' fifth claim is for violation of the ADA.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Police officers may violate Title II where "they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."  *Sheehan v. City and Cnty. of S.F.*, 743 F.3d 1211, 1232 (9th Cir. 2014).

As with the *Monell* claim, Plaintiffs fail to address Defendants' ADA arguments; therefore, they have abandoned these claims.  *See Jenkins v. Cnty. of Riverside*, 398 F.3d at 1095 n.4 ("Plaintiff abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment.")  Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' fifth claim.

### G. State-Law Claims

Plaintiffs' sixth through eleventh claims are state-law claims.  The SAC alleges survival actions for wrongful death due to negligence; violation of California's Bane Act, Civil Code section 52.1; assault; battery; and intentional infliction of emotional distress.  It also alleges a claim for negligent infliction of emotional distress brought by Plaintiff David Michael Perkins.  (SAC ¶¶ 79–94.)  Defendants argue that summary judgment should be granted as to all state-law claims.  (Mot. at 21–25.)  The Court addresses each of these claims in turn.

#### 1.    Wrongful Death - Negligence

Plaintiffs' sixth claim is for wrongful death due to the Officer Defendants' negligence.  Defendants incorrectly argue that the inquiry "is precisely the same as that required under the Fourth Amendment analysis, i.e., a consideration of the totality of the circumstances facing the officer."  (Mot. at 21–22 (citing *Hernandez v. City of Pomona*, 46 Cal. 4th 501, 513 (2009)).)  As Plaintiffs note, "state negligence law is . . . broader than federal Fourth Amendment law" and officers' tactics and decisions "preceding the use of deadly force are relevant considerations under California law in determining whether the use of deadly force gives rise to negligence liability."  (Opp. at 24 (quoting *Han v. City of Folsom*, 551 F. App'x 923, 926 (9th Cir. 2014)).)

"Under California law, the officer's pre-[use-of-force] decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly

force [] might be reasonable in isolation." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) (citing *Grudt v. City of L.A.*, 2 Cal. 3d 575 (1970)). "Federal law [] generally focuses on the tactical conduct at the time [force is used], though a prior constitutional violation may proximately cause a later excessive use of force[.]" *Tabares,* 988 F.3d at 1125.

Courts examining whether officers' conduct was negligent must consider "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Id.* (citing *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (internal quotation marks omitted)). Furthermore, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* (citing *Deorle*, 272 F.3d at 1283).

Here, based on the analysis of the evidence set forth in Section III. D, *supra*, Morrison is entitled to summary judgment on Plaintiffs' negligence claim. However, as discussed in Sections III. A. 1–2, *supra*, Edgar, Reynoso, Lee and Wang are not entitled to summary judgment on Plaintiffs' excessive use of force claim. That analysis applies with equal force here and precludes summary judgment on Plaintiffs' negligence claim. Moreover, evidence of Lee and Wang's pre-use-of-force conduct—which did not ultimately impact the Fourth Amendment use-of-force analysis in Section III. A, *supra*—is material to the state-law negligence claim. Factual issues on this front provide an alternate ground for denying summary judgment in favor of Lee and Wang on Plaintiffs' negligence claim.

Here, the objective video evidence plainly reveals that Perkins was mentally ill, that he was struggling to respond to Lee and Wang's questions, and that Perkins informed Lee and Wang he was on medication. (Lee Cam at 2:30–3:20.) Any reasonable officer would

have concluded that Perkins was mentally ill based on Perkins' conduct while interacting with Lee and Wang.  As such, the Court finds that Wang and Lee were reasonably on notice to comply with relevant police procedures for interactions with and/or uses of force against mentally ill suspects.  Moreover, the governmental interest in using potentially lethal force against Perkins was diminished by the fact that the officers were confronted with a mentally ill individual.  *See Tabares,* 988 F.3d at 1125.

Relevant ADP policy trained Wang and Lee to approach in a non-threatening manner when contacting a mentally impaired person in the field.  (Plaintiffs' Statement of Additional Material Facts ¶ 11.)  Lee and Wang were also trained to establish rapport and engage in calm communication with mentally impaired individuals to let them know the officer is not a threat.  (*Id.*)  A reasonable juror could conclude that Lee and Wang violated police procedures when questioning Perkins.  For example, once it became clear that Perkins was mentally ill, Lee and Wang made no specific attempt to establish a rapport with him or assure him they posed no threat.  The video evidence shows that, at one point during the questioning, Perkins retreated and tried to close the door.  (Lee Cam at 3:40–4:00.)  It is undisputed that Wang placed his hand on the door, preventing Perkins from closing it all the way, and continued questioning Perkins.  As Perkins became increasingly disoriented and asked whether unspecified people were fighting, Wang and Lee made no attempt to retreat or calm Perkins.  Instead, Wang asked "What are you talking about? Who's talking to you? Have you taken any medication today?"  (*Id.* at 4:40–5:00.)  A reasonable juror could find that Lee and Wang failed to follow ADP training.  Lee and Wang's "failure to follow a safety rule promulgated by [their] employer, regardless of its substance, serves as evidence of negligence."  *Grudt*, 2 Cal. 3d at 588 (citations omitted).  In addition to the reasons set forth in Section III. A, a reasonable jury could also find that Lee and Wang's use of force was unreasonable under California law because their initial conduct was likely to agitate a mentally ill suspect, such as Perkins, and lead to a physical altercation.

Therefore, summary judgment is DENIED as to all Defendants on Plaintiffs' claim for wrongful death due to negligence.

### 2.     Bane Act

Plaintiffs' seventh claim alleges a violation of California's Bane Act.  "The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'"  *Reese v. City of Sacramento*, 888 F.3d 1030, 1040 (9th. Cir. 2018); Cal. Civ. Code § 52.1(a).  "Section 52.1 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'"  *Reese*, 888 F.3d at 1040 (quoting *Chaudry v. City of L.A.*, 751 F.3d 1096, 1105 (9th Cir. 2014)).  "The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim.  Thus, where a plaintiff's claims under the federal and state constitutions are co-extensive, the discussion of a plaintiff's federal constitutional claim resolves both the federal and state constitutional claims."  *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal. 2009).  "As the California Constitution contains a similar provision [to the Fourth Amendment], and the United States Constitution defines the minimum protection provided under the California Constitution, the same analysis applies here."  *Id.*

As discussed above, Morrison is entitled to summary judgment on Plaintiffs' excessive force claim.  However, Plaintiffs successfully raised triable issues of fact as to whether the other officers' use of force violated clearly established Fourth Amendment precedent.  Therefore, summary judgment is GRANTED as to Morrison, and DENIED as to Lee, Wang, Edgar and Reynoso on Plaintiffs' claim under the Bane Act.

34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Assault and Battery

Plaintiffs' eighth and ninth claims allege assault and battery by all Officer Defendants.  Claims for assault and battery survive summary judgment where there are triable issues of fact as to whether Defendants violated the Fourth Amendment. "[T]he same standards apply to both state law assault and battery and Section 1983 claims premised on constitutionally prohibited excessive force."  *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1020 (C.D. Cal. 2019) (citing *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012)); *see also Vos*, 892 F.3d at 1037–38 (reversing district court's grant of summary judgment on state law claims because the district court erred in holding that the use of deadly force was objectively reasonable).

As discussed above, Morrison is entitled to summary judgment on Plaintiffs' excessive force claim.  However, Plaintiffs successfully raised triable issues of fact as to whether the other officers' use of force violated clearly established Fourth Amendment precedent.  Therefore, summary judgment is GRANTED as to Morrison, and DENIED as to Lee, Wang, Edgar and Reynoso on Plaintiffs' claims for assault and battery.

### 4.   Intentional and Negligence Infliction of Emotional Distress

Plaintiffs' tenth and eleventh claims are for infliction of emotional distress. Specifically, Plaintiff Teresa Perkins asserts a claim on behalf of Perkins for intentional infliction of emotional distress ("IIED"), and Plaintiff David Michael asserts negligent infliction of emotional distress ("NIED") on his own behalf.

To prevail on the IIED claim, Plaintiffs must prove that the Officer Defendants engaged in outrageous conduct with the intent to cause Perkins harm, and that he suffered severe emotional distress as a result.  *See Potter v. Firestone Tire & Rubber Co.,* 6 Cal. 4th 965, 1001 (1993).  Other than stating the elements of the claim and asserting that Plaintiffs have failed to produce evidence of outrageous conduct or intent to harm, Defendants do not further discuss the IIED claim.  Based on the analysis of the evidence as outlined in

Sections III.C–D, above, the Court DENIES the motion as to the IIED claim against Edgar and Reynoso and GRANTS it as to Wang, Lee, and Morrison.

As for David Michael's NIED claim, under California law, "NIED is a tort in negligence, and the plaintiff must establish the elements of duty, breach of duty, causation, and damages." *Moon v. Guardian Postacute Services, Inc.*, 95 Cal. App. 4th 1005, 1009 (2002). In their opposition brief, Plaintiffs fail to specifically brief this claim. Moreover, Plaintiffs offer no evidence of David Michael's emotional distress, and have therefore failed to raise triable facts on the damages element of the NIED claim. Accordingly, all Officer Defendants are entitled to summary judgment on the NIED claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED on all of Plaintiffs' claims against Morrison; Plaintiffs' denial of medical care, loss of familial relations and IIED claims against Lee and Wang; Plaintiffs' *Monell* claim against the City of Anaheim; Plaintiffs' Americans with Disabilities Act claim against all Defendants; and Plaintiff David Michael's NIED claim against all Defendants. Defendants' Motion is DENIED in all other respects.

Dated: April 26, 2021

HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE